**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

KAREN LEISRING,

             Case No: 1:18-cv-698

     Plaintiff,        Bowman, M.J.

 v.

HAMILTON COUNTY CLERK OF COURTS, et al.,

     Defendants.

**MEMORANDUM OPINION AND ORDER**

Plaintiff Karen Leisring filed suit against her current employer, alleging that Defendant(s) engaged in unlawful age discrimination when she was not selected for a promotion. Although Plaintiff filed suit against both the Hamilton County Clerk of Courts and the Clerk of the Hamilton County Municipal Court, the two positions are represented by the same individual (hereinafter the "Clerk of Courts"). The Defendant Clerk has filed a motion for summary judgment, to which Plaintiff has filed a response and the Defendant has filed a reply. The parties have consented to the exercise of plenary jurisdiction by the undersigned magistrate judge. *See* 28 U.S.C. § 636(c). For the following reasons, Defendant's motion will be GRANTED.

**I.  Standard of Review**

In a motion for summary judgment, "a court must view the facts and any inferences that can be drawn from those facts ... in the light most favorable to the nonmoving party." *Keweenaw Bay Indian Comm. v. Rising*, 477 F.3d 881, 886 (6th Cir. 2007) (internal quotation marks omitted). "Summary judgment is only appropriate 'if the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' " *Id.* (quoting Fed. R. Civ. P. 56(c)) (internal quotation marks omitted). "Weighing of the evidence or making credibility determinations are prohibited at summary judgment-rather, all facts must be viewed in the light most favorable to the non-moving party." *Id.*

The requirement that facts be construed in the light most favorable to the Plaintiff, however, does not mean that the court must find a factual dispute where record evidence contradicts Plaintiff's unsupported allegations. After a moving party has carried its initial burden of showing that no genuine issues of material fact remain in dispute, the burden shifts to the non-moving party to present specific facts demonstrating a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348 (1986). "The 'mere possibility' of a factual dispute is not enough." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) (citing *Gregg v. Allen–Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)). In order to defeat the motion for summary judgment, the non-moving party must present probative evidence that supports its complaint. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505 (1986). The non-moving party's evidence "is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255, 106 S.Ct. 2505. The court determines whether the evidence requires submission to a jury or whether one party must prevail as a matter of law because the issue is so one-sided. *Id.* at 251–52, 106 S.Ct. 2505. To demonstrate a genuine issue of fact, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a

rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'
" *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348 (citation omitted).

## II.    Findings of Fact

Pursuant to the above standards, where any dispute exists, all reasonable inferences have been construed in Plaintiff's favor.

Since January 2017, the office of the Clerk of Courts has been held by Aftab Pureval, who has been sued in his official capacity. When Pureval began his tenure in January 2017, he was not aware of any formal policies for hiring and promotion and his administration set out to create a new process that was professional, based on merit, and objective. It was the administration's goal to run a "transparent merit-based system where jobs are posted, where employees who are seeking promotion or outside candidates are interviewed by a panel," and formally scored, with final decisions made "on the totality of the application and interview process." (Pureval Depo., Doc. 28 at PageID 807). Pureval hired several administrators to help accomplish this goal, including the Chief of the Municipal Division, David Sturkey.[1] Sturkey oversaw two Assistant Chiefs: one civil and one criminal. Jesslina "Jess" Isom served as the Assistant Chief of the Civil Division.

Pureval also hired Shonda Sullivan, age 33, to serve as Chief of Human Resources.[2] Sullivan played a key role in developing and implementing a new hiring and promotion process. She provided training on how to conduct an interview to help interviewers avoid implicit bias,[3] so that "every candidate was evaluated based on their

---

[1]Immediately after Pureval was elected, Sturkey reported directly to Pureval. Over time, however, Pureval hired a Chief Administrator, Greg Brush, and Sturkey began reporting to Brush instead. Sturkey no longer works for the Defendant.

[2]Sullivan testified that she left her position with the Clerk for another organization after approximately 18 months.

[3]The phrase "implicit bias" has become relatively familiar in modern lexicon. Although statistical evidence may be used to support disparate impact claims in a manner that arguably would capture some "implicit

responses to the same questions." (Sullivan Depo., Doc. 20 at PageID 372). She also added "scoring grids" and "introduced the concept of a panel interview, so it was multiple perspectives" rather than the perspective of a single interviewer. (*Id.*)

Irrespective of the Defendant's stated intention to create a merit-based and impartial system, Plaintiff claims that she was denied a promotion in March 2018 based upon age discrimination. Plaintiff began work for the Defendant in December 2012, and had been working in the Case Management Division for four years at the time she sought a promotion to Supervisor. She was 67 years old. A three-person panel comprised of Sturkey, Sullivan and Isom, selected Catherine Smith, who worked in a different division and was 28 years old, for that promotion.

The vacancy for the Supervisor position was created when the person occupying that position, Jerry Poland, moved to the Common Pleas Division. In her position in the Case Management Division, Plaintiff directly reported to Poland, while Poland himself reported to Isom. Poland recommended Plaintiff for the promotion.

During the time in which Plaintiff was working under Poland, from September through November 2017, he took a medical leave of absence. Plaintiff testified that Sturkey identified her as the "interim supervisor" in a small group meeting held during Poland's absence. (Leisring Depo., Doc. 18 at PageID 290-291). Although Isom assigned Plaintiff some of Poland's duties during that period, Isom testified that she - and not Plaintiff - assumed Poland's supervisory duties during his leave of absence. In fact, Isom previously had held the Supervisor position prior to her promotion to Assistant Chief of

---

bias" claims, federal employment discrimination law on the whole prohibits only conscious or intentional discrimination.

4

the Civil Division.  Plaintiff did not receive any change in pay or work any overtime during the time that she temporarily assumed additional duties.

**The Supervisor Position and the Application Process**

In March 2018, Sullivan sent an internal email to advertise the Supervisor position and elicit interest as "Phase 1" of a new three-part hiring and promotion process.  The listed job requirements included: knowledge of Municipal Civil Division operations; the ability to provide excellent customer service and to supervise others effectively and confidently, to engage in difficult conversations and manage different personality types, with skills in data entry and analysis, basic computer functions, the routine work of the Municipal Civil division and leadership, and with specified preferences for "[s]ome Municipal Civil Division experience," "experience working with Magistrates and/or Judges," and at least one year of supervisory experience. (Doc. 20-1 at PageID 528).

After receiving responses and resumes, Sullivan evaluated applicants to "remove candidates from consideration" who did not meet the criteria.  (Doc. 20 at PageID 422-423).  Sullivan based her Phase 1 screening on her "historical knowledge" of the applicants, as well as her brief review of their resumes and email expressions of interest. Sullivan's notes reflect she rated Smith as a "high pass" candidate during the Phase 1 screening but rated all other applicants, including Plaintiff, as "low pass" candidates. There is no evidence that Sullivan subsequently shared her initial "high pass" or "low pass" assessments with Sturkey or Isom or that her preliminary assessment was considered by anyone beyond Phase 1.

All applicants who passed Phase 1 were sent a list of written questions via email and asked to respond as part of "Phase 2." Following analysis of their responses, the panel made up of Sullivan, Isom and Sturkey decided who would proceed to "Phase 3":

the in-person interview.  (Isom Depo., Doc. 16 at PageID 141-142).  The panel selected the following four candidates to interview: Smith (age 28), Plaintiff (age 67), Sara Buller (age 54), and Paula London, a candidate who Sullivan believed to be in her 50's or 60's. Thus, three of the four candidates selected were in a protected age group.

In preparation for the interviews, the panel compiled a list of 18 written questions. Sturkey testified that the questions were designed to be open-ended "to give people an opportunity to sell themselves."  He testified that he viewed the interview performance of the candidates as very important in the hiring decision.

> [T]he way that candidates answered questions, especially in terms of…vision and change, and professionalism and modernization of the office were all very, very important…  I wanted to hear candidates, I wanted to talk to candidates in the interviews about their ideas about those types of things. So that's something that didn't necessarily come through in prior work experience.

(Sturkey Depo., Doc. 25 at PageID 646-649).

Isom explained that she went into the interviews "looking for someone that was displaying zeal…someone who brought – was going to bring about, ion my mind at the time, organizational ideas, opportunities for other people to, you know, be able to give idea[s] on efficiency." (Doc. 16 at PageID 196-197).  Isom testified she "[d]idn't want it to be business as usual…I wanted just that energy that this was a role that this person wanted and they were going to, you know, be driven or go even further."  (*Id.* at PageID 197).  Sullivan similarly testified that the panelists were looking for someone who exhibited strong leadership, a desire to make change and innovate, with an eye for identifying problems and solution-focused initiative and drive.  (Doc. 20 at PageID 488).

During the interviews, the panelists alternated asking the 18 questions of each candidate.  The panelists took contemporaneous notes and each panelist scored the

candidates' responses after the interviews. Their consensus was that Buller would be their first choice candidate according to her scored responses. However, the panel agreed not to offer Buller the position because during the interview, she essentially withdrew her name from consideration by indicating she would prefer to retain the duties of the position she then held in the Criminal Division.

Smith's scored responses put her in second place, closely followed by Plaintiff and more distantly by London. In recognition of how close Smith's and Plaintiff's scores were, the panel met several times to discern which of those two candidates they would promote. According to all three panelists, both the interviews and the post-interview discussions of the "pros and cons" of each candidate proved to be critical in selecting Smith over Plaintiff. Isom was given authority to make the final decision. Pureval was not involved in the process, but was informed once the promotion decision had been made. The panelists uniformly testified that Plaintiff's responses to several interview questions were not as strong as Smith's responses. They further testified that Smith performed exceptionally well in her interview, while Plaintiff did not.

## III. Analysis

### A. Plaintiff Has Established a Prima Facie Case

The Age Discrimination in Employment Act ("ADEA") prohibits discrimination "because of such individual's age." 29 U.S.C. § 623(a). "A plaintiff may establish a violation of the ADEA by either direct or circumstantial evidence." *Geiger v. Tower Auto.*, 579 F.3d 614, 620 (6th Cir. 2009). With both direct and circumstantial evidence, "the burden of persuasion remains on ADEA plaintiffs to demonstrate 'that age was the "but-for" cause of their employer's adverse action.'" *Id.* (quoting *Gross v. FBL Fin. Servs.*, 557 U.S. 167, 177 (2009)). "[I]t is not sufficient for the plaintiff to show that age

was a motivating factor in the adverse action[.]" *Scheick v. Tecumseh Pub. Schs*, 766 F.3d 523, 529 (6th Cir. 2014) (citing *Gross*) (emphasis added). Rather, the plaintiff must show that age was the "reason" that the employer decided to act. *Id.* (citing *Univ. of Tex. Sw. Med. Ctr. V. Nassar*, 570 U.S. 338, 350 (2013) (emphasis added.)).

On the record presented, Plaintiff does not claim to have direct evidence that if believed, "requires the conclusion that age was the 'but for' cause of the employment decision." *Scheick*, 766 F.3d at 530. Instead, Plaintiff relies upon circumstantial evidence to prove her claim. "[A]pplication of the *McDonnell Douglas* evidentiary framework to prove ADEA claims based on circumstantial evidence remains consistent with *Gross*." *Scheick*, 766 F.3d at 529 (citations omitted).

Circumstantial evidence "is proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred." *Geiger*, 579 F.3d at 620 (quoting *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003) (en banc)). To set forth a prima facie case of age discrimination using circumstantial evidence, a plaintiff must establish the four elements of the iconic *McDonnell Douglas* test: 1) she was a member of a protected class; 2) she suffered an adverse employment action; 3) she was qualified for the position held; and 4) the person who received the promotion was outside the protected class. *See Geiger*, 579 F.3d at 622; *see also Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582-83 (6th Cir. 1992). The mandate to make a prima facie case "is not intended to be an onerous one." *Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 590 (6th Cir. 2014).

Defendant concedes that Plaintiff has come forward with proof to establish the first three elements of her prima facie case under the *McDonnell Douglas* test. However, Defendant argues that whether Plaintiff has satisfied the fourth element of her prima facie

case - that an individual of similar qualifications who was not a member of the protected class received the job at the time that Plaintiff's request for promotion was denied – remains "at issue."  *See Nguyen v. City of Cleveland*, 229 F.3d 559, 562-63 (6th Cir. 2000).  In support of this argument, Defendant appears to argue that it is entitled to summary judgment because Smith and Plaintiff were not similarly situated.

Defendant's argument is not persuasive, particularly on summary judgment where all reasonable inferences from the record are to be drawn in Plaintiff's favor.  In fact, in another portion of its brief, Defendant concedes that Smith and Plaintiff "were arguably similarly qualified at least for purposes of the prima facie stage."  (Doc. 32 at 10, PageID 788).  Defendant admits that Smith and Plaintiff shared many similar qualifications, including high school diplomas, customer service experience, and at least one year of supervisory experience, and that both candidates received similar point scores from the panel.  In opposition to summary judgment, Plaintiff argues that because the Defendant concedes that the fourth element of her prima facie case is "at issue," the Defendant has conceded that a genuine dispute of material fact remains.  The Court agrees.  Therefore, Defendant's motion for judgment based upon Plaintiff's alleged inability to establish her prima facie case is denied.

### B. The Defendant Has Articulated Facially Nondiscriminatory Reasons for the Failure to Promote, Which Plaintiff Has Failed to Rebut

Even though Plaintiff has established her prima facie case, the Defendant is still entitled to summary judgment because it has offered facially nondiscriminatory reasons for promoting Smith over Plaintiff, which Plaintiff has failed to show are pretextual.

### 1. The Defendant's Stated Reasons are Nondiscriminatory

"Once a plaintiff has established a prima facie case of age discrimination, the

burden shifts to the defendant employer to come forward with a legitimate, nondiscriminatory reason for the adverse employment action." *Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d at 590 (citation omitted). "The plaintiff then bears the burden of demonstrating that the proffered reason was in fact a pretext designed to conceal unlawful discrimination." *Id.* Pretext can be shown in one of three ways: by offering evidence that 1) the employer's stated reason had no basis in fact; 2) the stated reason did not actually motivate the employer; or 3) the stated reason was insufficient to warrant the adverse employment action. *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2001) (citing *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)). The three-part test to show pretext "need not be applied rigidly" but rather "is a commonsense inquiry." *Blizzard v. Marion Tech. College*, 698 F.3d 275, 285 (6th Cir. 2012).

Here, the Defendant's articulated reasons for the failure-to-promote focus on Phase 3: the interview and post-interview assessment of the candidates' respective "pros and cons." The Defendant states that Smith was chosen over Plaintiff based upon: (1) Plaintiff's generally poor interview performance; (2) Plaintiff's failure to demonstrate the stated goals of the new administration during her interview; and (3) Smith's strong interview performance and demonstration of said goals. Plaintiff argues first that Defendant's proffered reasons do not satisfy the Defendant's relatively light burden to articulate a legitimate non-discriminatory reason. Instead, Plaintiff asserts that the Defendant's articulated reasons reflect "the very types of ageist stereotypes the ADEA was enacted to combat." (Doc. 35 at PageID 889). She points to testimony by Sturkey and Sullivan that in her interview, she was perceived to exhibit a lack of "drive and motivation... to make reformations or significant changes" and her alleged lack of "general

aggressive, innovative thinking and desire to make change." (Doc. 25 at PageID 659; Doc. 20 at PageID 493). Plaintiff argues that their comments demonstrate ageist assumptions that "older workers are more resistant to change and are adverse to learning new methods." *See Hartsel v. Keys*, 87 F.3d 795, 802 (6th Cir. 1996).

Contrary to Plaintiff's interpretation, the Defendant's stated reasons are *facially* non-discriminatory. To conclude otherwise would require this Court to assume that no one younger than 40 can exhibit traits such as a lack of innovation and drive. To interpret the articulated reasons as reflective of "stereotypical attitudes about older workers" also unfairly conflates the Defendant's burden to articulate a nondiscriminatory reason for its action with Plaintiff's ultimate burden to show discrimination and pretext. Ironically, in the case cited by Plaintiff, the court affirmed the grant of summary judgment to the employer after pointing out that it was plaintiff herself who was invoking ageist stereotypes in an attempt to characterize the employer's reasons as discriminatory. *See Hartsel*, 87 F.3d at 802.

Because the Defendant has articulated legitimate reasons for its failure to promote Plaintiff, in order to survive summary judgment, Plaintiff must come forward with enough evidence to create a genuine issue of material fact about whether the Defendant's stated reasons were in fact pretextual. *See Logan v. Denny's, Inc.*, 259 F.3d 558, 567 (6th Cir. 2001). The evidence must be sufficient that a "jury may reasonably reject the employer's explanation." *Manzer*, 29 F.3d at 1083. By contrast, a defendant will be entitled to summary judgment where a plaintiff produces less than a preponderance, or no more than a scintilla, of evidence to demonstrate pretext. *See Hedrick v. Western Reserve Care,* 355 F.3d 444, 461 (6th Cir. 2004) (affirming summary judgment because plaintiff "failed to demonstrate, by a preponderance of the evidence, that [employer's] proffered

reason for not hiring her…was a pretext for age discrimination.")  "At the pretext stage, the plaintiff's burden of production 'merges' with his ultimate burden of persuasion to show that age discrimination was the but-for cause of his termination."  *Willard v. Huntington Ford, Inc.*, ___WL___ (6th Cir. March 11, 2020) (internal citations omitted). Plaintiff fails to meet this burden.

### 2. Neither Sullivan's "Leadership Training" Nor Her Phase 1 Screening Raise a Genuine Issue of Material Fact on Pretext

Plaintiff argues that Sullivan's characterization of Smith as a "high pass" in comparison to her characterization of Plaintiff as a "low pass" at the Phase 1 screening conducted by Sullivan is evidence of age discrimination.  However, Plaintiff offers nothing more than her own speculation to support her hypothesis.  Such conjecture is insufficient to create a genuine issue of material fact on pretext.

Sullivan testified that she eliminated applicants at the Phase 1 screening process based upon no more than the applicants' emailed expressions of interest, their resumes, and Sullivan's "historical knowledge" of the candidates.  There is no evidence that Sullivan shared her preliminary "high pass" or "low pass" screening evaluations with anyone else on the panel. She testified her preliminary "high pass" and "low pass" screening evaluations were not considered at all in the final selection.  In fact, Sullivan rated Buller (and every other candidate other than Smith) as a "low pass" during her Phase 1 screening, even though Buller scored the highest after the interviews and would have been the first choice candidate but for her expressed reluctance to leave her then-current position.

At Phase 1, Sullivan's "historical knowledge" of the applicants included her personal familiarity with Smith through "leadership development meetings" that Sullivan

organized and led. She invited Smith to participate based on Sullivan's recall that Smith had inquired about leadership opportunities and her belief that Smith had "clearly emerged as a natural leader in her area." (Doc. 20, PageID 406-408).

Although Smith testified that it was Sullivan who initiated the invitation for her to attend, it is undisputed that Smith had submitted applications for other positions, and that Sullivan interviewed her (but did not select her) for one of those positions.[4] Sullivan testified that because two others in the same Division had sought similar promotional opportunities, Sullivan invited all three (Smith, Buller, and Monohan) to attend the leadership development meetings as a group. (Doc. 20 at PageID 461). Sullivan testified she intended "to pilot a coaching development process with these three" which, if successful, she could later implement more widely. (*Id.*) The three women met with Sullivan informally as a group five or six times over their lunch hours. However, Sullivan left the Clerk's office prior to implementing the program on any wider scale.

Plaintiff makes much of the fact that Sullivan did not invite Plaintiff to attend the leadership development meetings, suggesting that Sullivan deliberately invited Smith based solely upon Smith being "40 years Plaintiff's junior." (Doc. 35 at PageID 884). However, in contrast to Smith who sought prior promotion and Sullivan's unrebutted testimony that the other two group members also sought promotional opportunities, Plaintiff never sought any other promotion or Sullivan's guidance. Plaintiff's assertion that Sullivan based the invitations on age is further undercut by the fact that Sullivan invited Buller, who was in her mid-50's at the time and also within the protected age class. Thus, neither Sullivan's failure to invite Plaintiff to participate in leadership training, nor her initial

---

[4]The Court finds this minor discrepancy to be immaterial. There is no dispute that Sullivan was aware of Smith's prior application(s). (Doc. 14 at PageID 62).

assessment of Plaintiff as a "low pass" at the Phase 1 screening level for the Supervisor position, supports an inference of pretext.

### 3. A Comparison of Qualifications Does Not Raise a Genuine Issue of Material Fact on Pretext

The record indisputably reflects that the Phase 3 factors of the interviews and the panel's post-interview discussions of the "pros and cons" of each candidate were critical in the panel's decision, Nevertheless, Plaintiff focuses on her qualifications alone in an attempt to show pretext. The essence of Plaintiff's argument is that she was so vastly more qualified than the much younger Smith that no rational employer could have selected Smith in the absence of discriminatory animus, and that the Defendant's claim that Smith was more qualified therefore is not worthy of belief.

The cases in which a disparity between the qualifications of the chosen candidate and the plaintiff is sufficient, standing alone, to show pretext are few and far between. Nevertheless, the Sixth Circuit has held that a plaintiff *may* be able to show pretext on the basis of qualifications alone, if the plaintiff's qualifications are "so significantly better" as to far exceed those of the chosen applicant. *See generally White v. Baxter Healthcare Corp.*, 533 F.3d 381, 393-394 (6th Cir. 2008) (holding that African-American candidate was so significantly better qualified that a factfinder could infer pretext, and that the employer *consciously* selected the less-qualified white candidate for promotion based upon discrimination).

> Whether qualifications evidence will be sufficient to raise a question of fact as to pretext will depend on whether a plaintiff presents other evidence of discrimination. In the case in which a plaintiff does provide other probative evidence of discrimination, that evidence, taken together with evidence that the plaintiff was as qualified as or better qualified than the successful applicant, might well result in the plaintiff's claim surviving summary judgment…. On the other hand, in the case in which there is little or no probative evidence or discrimination, to survive summary judgment the

rejected applicant's qualifications must be so significantly better than the successful applicant's qualifications that no reasonable employer would have chosen the latter applicant over the former. In negative terms, evidence that a rejected applicant was as qualified or marginally more qualified than the successful candidate is insufficient, in and of itself, to raise a genuine issue of fact that the employer's proffered legitimate, non-discriminatory rationale was pretextual.

*Bender v. Hecht's Dept. Stores*, 455 F.3d 612, 626-27 (6th Cir. 2006) (citation omitted).

Despite the possibility that a plaintiff's vastly superior qualifications can create an issue of fact concerning pretext, particularly when combined with other evidence of discrimination, the Sixth Circuit much more frequently has emphasized that "employers are generally 'free to choose among qualified candidates,' and that '[t]he law does not require employers to make perfect decisions, nor forbid them from making decisions that others may disagree with[.]'" *O'Dell v. State*, 2018 WL 662245 (6th Cir. Feb. 1, 2018) (quoting *Bender*, 455 F.3d at 627, additional citations omitted). A court is not to act as "super-personnel department." *See Hedrick*, 355 F.3d at 462 (citations omitted). Thus, "it is inappropriate for the judiciary to substitute its judgment for that of management." *Id.*,(quoting *Smith v. Leggett Wire Co.*, 220 F.3d 752, 763 (6th Cir. 2000)). "Rather, our inquiry is limited to whether the employer gave an honest explanation of its behavior." *Id.* (internal quotation marks and citation omitted). "[W]hen qualifications evidence is all (or nearly all) that a plaintiff proffers to show pretext, the evidence must be of sufficient significance itself to call into question the honesty of the employer's explanation." *Bender*, 455 F.3d at 627 (additional citation omitted).

Plaintiff has failed to present such "significant" evidence in this case. Instead, and contrary to her subjective perception of her qualifications, the record reflects that the two candidates had differing strengths and weaknesses but fairly similar qualifications. In fact, the Court concludes that a reasonable fact-finder could find that Smith was the more

qualified candidate.

### a. Supervisory and Municipal Court Experience

In support of her claim that her qualifications far surpassed those of Smith's, Plaintiff begins by comparing her supervisory and Municipal Court experience with Smith's. The written requirements for the Supervisor's position state a preference for "at least one (1) year of supervisory experience." (Doc. 20-1 at PageID 528). Plaintiff points to nearly 20 years of what she describes as supervisory experience with LasikPlus. However, Plaintiff directly supervised no more than 2 or 3 employees at any time.[5] During the years she was employed at LasikPlus, she did not actually hire, fire, or discipline any of the people who directly reported to her. She testified that she did not have authority to make that type of decision "on my own" but instead would have consulted with the vice president of HR or with her direct supervisor at LasikPlus. (Doc. 18 at PageID 274).

Still, Plaintiff argues that Smith not only had less experience but did not meet the "one year" stated preference in the job posting, because although Smith oversaw 17 people, her tenure as General Manager of a Holiday Inn Express lasted for just nine months, and she was involuntarily terminated from that position.[6] (Smith Depo, Doc. 14 at PageID 69, 51-52). However, Smith testified in her deposition that she also had worked as an Assistant GM at the Blue Ash Holiday Inn Express for about eight months, followed by a position as Sales Manager for three different locations, before ending her employment as GM at the Sharonville location.[7] Thus, Smith's supervisory experience in

---

[5]In contrast to her deposition testimony, Leisring reported in her written application that she had supervised 10 "direct reports" over a period of 5 years.
[6]There is no evidence that the panelists were aware that Smith was involuntarily terminated. It is beyond this Court's purview to consider evidence of which the decision-makers had no knowledge. Smith testified that occurred during a period of renovations, when the hotel was receiving poor customer reviews. (Doc. 14 at PageID 51)
[7]Like Plaintiff, Smith's written application did not precisely match up with her deposition testimony. In her

the private sector well exceeded the stated one year "preference."

Further comparing the two candidates' private sector supervisory experience, it appears that Smith had different, but at least equivalent (if not greater), supervisory experience than Plaintiff. Plaintiff had a greater number of years of experience, but she had less authority than Smith did to hire, fire, and discipline and did not directly supervise as many employees. *See Hawkins v. Memphis Light Gas and Water*, 2011 WL 6012503 at *8 (W.D. Tenn. Dec. 1, 2011) (holding that plaintiff's decade of experience as a supervisor did not make him "so significantly" better qualified as to survive summary judgment).

Turning to relevant experience with the Clerk of Court, Plaintiff testified that she also had greater qualifications in that context. Drawing reasonable inferences in Plaintiff's favor, the Court finds that Plaintiff assumed *some* temporary supervisory duties in 2017 when Poland took a medical leave.[8] At the time, Plaintiff learned in a group meeting that she was to serve as the interim supervisor during Poland's absence. Plaintiff signed at least one email (to Isom) with an "Acting Supervisor" designation. (Doc. 18 at PageID 289-291, 319). Although the extent to which Plaintiff assumed Poland's supervisory responsibilities remains disputed,[9] the undersigned credits Plaintiff's testimony on summary judgment. (Doc. 18 at PageID 288-294). Still, Plaintiff's temporary promotion to "acting" supervisor does not prove pretext or preclude summary judgment being

---

application, Smith stated that she was a "supervisor/general manager for 2.5 years," during which time she "was in charge of overseeing the daily operations of 10-12 employees." (Doc. 20-1 at PageID 530).
[8]Plaintiff herself could not identify what those duties were. (Doc. 18 at PageID 296).
[9]Isom previously served as Supervisor before Poland and therefore was familiar with the duties. She testified that she worked overtime as well as performed extra duties during Poland's leave of absence in an effort to keep up. (Doc. 16 at PageID 194). Plaintiff testified that she was able to complete additional assigned duties without working any overtime, but also stated in her written application that Poland's absence resulted in the division "not being able to process the work timely." (Doc. 20-1 at PageID 533).

granted in favor of the Defendant. *See Hartsel v. Keys*, 87 F.3d at 804-805 (6th Cir. 1996) (holding that the plaintiff's success as Acting Superintendent was insufficient to create issue of fact on pretext, where the Defendant had offered facially nondiscriminatory reasons for the selection of another).

As additional support for her claim of significantly better qualifications, Plaintiff points out that in February 2018, she was promoted to be the designated "LEAD" position in her division - a new position created by Pureval. (Doc. 18, PageID 304, 282). Sullivan testified that the LEAD position "was generally the highest performer" in the department, and was expected to assist with supervisory duties in the event of the supervisor's absence. (Doc. 20 at PageID 393). A document entitled "LEAD Designation Description" describes the position as a "non-supervisory role" but (somewhat contradictorily) states that 10% of the "essential duties" of a LEAD include "Operations Management and Coaching." (Doc. 18-2 at PageID 334). One of the four tasks listed under "Operations Management and Coaching" is "Direct the work flow and distribute responsibilities during supervisor's absence." (*Id.*) No other "supervisory" duties are listed and based on the timing of Plaintiff's designation, it does not appear that Plaintiff performed supervisory duties in 2018.

Attempting to distance Smith's qualifications as vastly inferior, Plaintiff asserts that Smith "did not meet even the minimum qualifications" because she worked in the Common Pleas Division and did not have experience in the Municipal Civil Division. The Supervisor position required "knowledge of" Municipal Civil Division operations and skills in the "[r]outine work of the Municipal Civil division" but was not restricted to applicants who worked within that division. (Doc. 20-1 at PageID 528). In fact, the panel's first choice candidate, Buller, worked in the same Common Pleas Division as Smith. Smith explained

in her interview how her prior work with the Clerk of Court translated to the many processes in the Municipal Civil Division. (Doc. 14 at PageID 88-89). The panelists testified without contradiction that Smith possessed all required skills, based on the similarities and overlap between the systems. Sturkey explained that the "entire office uses the same case management software, so she was obviously very familiar with that and how to use that, but [Smith's] knowledge of what we did down there and why really stood out to me." (Doc. 25 at PageID 663). Whereas Smith spoke about her prior experience in a specific way and made connections on how it related to the Supervisor role, Plaintiff did not bring up how her prior experience contributed to her qualifications during her interview. (Doc. 25 at PageID 666; Doc. 20 at PageID 492-493; Doc. 18 at PageID 313).

As the Defendant points out, Smith also had greater exposure to magistrates and judges - another required qualification for the position. (Doc. 20 at 499). In response to a written question about whether the applicant had worked directly with judges or magistrates, Smith responded unequivocally to "daily" experience: "Yes, while working in Municipal criminal/traffic I worked with both judges and magistrates daily." (Doc. 20-1 at PageID 530). Plaintiff responded much more equivocally, "only when they come to our area with a question regarding a case." (*Id.* at PageID 532; *see also* Doc. 20 at PageID 433-437).

In sum, although Plaintiff undoubtedly was more familiar with the day-to-day work of the Municipal Civil Division, the record does not present any genuine issue of material fact that Smith was *at least* as well-qualified and easily met or exceeded all requirements for the Supervisor position. Based on written and interview responses, Smith appeared to have greater knowledge of municipal civil "processes," had more experience with

judges and magistrates, and exhibited a greater desire to make change and innovate.

### b. Performance Reviews and Supervisor's Recommendations

In addition to stressing her supervisory experience and familiarity with the Municipal Civil Division, Plaintiff strenuously argues that she was the better qualified candidate "[b]ecause I had very good performance reviews." (Doc. 18 at PageID 305). There is no question that Defendant thought highly of Plaintiff. Sullivan and Isom agreed that "Karen was a very high performer." (Doc. 20 at PageID 383, 392). Plaintiff consistently received high performance evaluations as a "standout" employee. (Doc. 20 at PageID 383, 420; Doc. 25 at PageID 647-648, Doc. 16 at PageID 143-144). Plaintiff contends that the panel's acknowledgment of her as a "standout" employee is inconsistent with their failure to select her for promotion.

Respectfully, the Court must disagree. An employee may be extremely conscientious and a great performer, but still be honestly (even if mistakenly) perceived to lack the specific leadership skills that the panel stated it was seeking for the Supervisor position. Just as not every player makes a great coach; not every exceptional front-line worker makes an exceptional manager. As Sullivan explained, the Defendant most heavily weighted the interview. The recognition that Plaintiff "was a high performer and was consistent and dependable" did not "necessarily mean that she exhibits forward thinking or the supervisory skills that we were looking for…which is why we interviewed." (Doc. 20 at PageID 395).

Returning to a comparison of past performance, Plaintiff points out that Smith's supervisor(s) rated her as "below average" in the specific area of "attendance" on two prior performance evaluations. (Doc. 14 at PageID 77-78). However, there is no evidence that <u>anyone</u> on the panel, including Sullivan, was aware of Smith's alleged attendance

issues. (*See* Doc. 20 at PageID 386). More importantly, there is no evidence that performance reviews were considered in the selection process as Sullivan testified that they were "spotty" and "incomplete and inconsistent." (Id. at PageID 385). And even if the panelists had been aware of the alleged past attendance issues (which again, there is no evidence to support), that fact still would not raise the inference of pretext. *See Bhama v. Mercy Memorial Hosp. Corp.*, 416 Fed. Appx. 542, 552 (6th Cir. March 25, 2011) (affirming summary judgment despite chosen candidate's attendance issues because while the plaintiff "may honestly believe that Mercy made the wrong decision and…ignored relevant factors in doing so, a reasonable jury could not infer a discriminatory animus from this unsupported conjecture.").

For similar reasons, the fact that the panelists chose not to consider the recommendation of the current Supervisor, Poland, does not provide sufficient evidence to present to a jury. Although Plaintiff does not know to whom Poland recommended her, (Doc. 18 at PageID 305; Doc. 20 at PageID 416-418), Sullivan was generally aware of his recommendation. Plaintiff clearly disagrees with the disregard of the recommendation, but her wish that the panel had focused on different criteria does not establish pretext, so long as the selected criteria were not discriminatory. None of the panelists testified that they considered the recommendations from the candidates' superiors to be particularly relevant. Of note, Smith also received a recommendation from Rick Hofmann, Chief Deputy of the Common Pleas Division and Smith's department head, but Sullivan equally disregarded his recommendation. (Doc. 20 at PageID 418). Poland was not involved in the promotional process. When asked whether his recommendation carried any weight, Sullivan responded:

> I won't say it carried weight. If he hadn't recommended her, then it would

be a concern, but I would say it's general practice of the clerk's office that historically everyone was recommended for everything.

(Doc. 20 at PageID 417).

Plaintiff asserts that Sturkey "conceded that [Poland's recommendation] would have been given weight had he known of it." (Doc. 35 at PageID 894, citing Sturkey Deposition. at PageID 645-646). However, the transcript pages to which Plaintiff cites contain no such testimony. Sturkey initially could not recall whether "maybe" Poland had said "something…in passing" to recommend Plaintiff. (Doc. 25 at PageID 646). At a later point in his deposition, Sturkey thought that "Jerry did say either to Jess [Isom] or myself that he liked Karen for the role," (*Id.* at PageID 725), but went on to explain that Poland had been demoted "a couple times" into the Supervisor position. In Sturkey's view, Poland "had lost the confidence of his staff" in that position and "was not the reform-minded leader that we wanted in that role." (*Id.* at PageID 726-727). Isom testified that she was Poland's boss, that he "did a good job" as Supervisor and "talked about what a good job [Plaintiff] was doing in her role." (Doc. 16, PageID 132-133). However, she did not recall that Poland conveyed a recommendation that Plaintiff be selected by the panel to replace him. Certainly there is no evidence to suggest that Isom would have been influenced by Poland's recommendation if he had made one or if she had recalled it.

Plaintiff's focus on Poland's alleged recommendation as proof that the articulated basis for Smith's selection had "no basis in fact" is unpersuasive. Plaintiff argues that "[a] reasonable jury could find that Sullivan concealed information that the other panelists would have found useful – so as to advantage younger applicants who did not have Poland's recommendation….." (Doc. 35 at PageID 894). However, the record is utterly devoid of evidence that Sullivan "concealed" Poland's recommendation or that the

recommendation would have changed (or even influenced) the outcome. Poland's recommendation is therefore insufficient to show pretext.

### 4. The Evaluations of Interview Performances Do Not Show Pretext

As stated, the reasons articulated by the Defendant for its selection of Smith over Plaintiff chiefly relate to Plaintiff's relatively poor interview performance as compared to Smith's stronger performance. Defendant argues that the "scoring rubric, testimony, and the notes of the three individuals who conducted the interviews for the position" all support Defendant's conclusion that Plaintiff did not interview well in comparison to Smith. (Doc. 37 at 3). The undersigned agrees. Courts have repeatedly upheld the right of employers to base their selection on interview performance, notwithstanding the acknowledgment that interview performance is inherently subjective.

Plaintiff cites to cases in which courts have suggested that "inherently subjective" interview determinations deserve careful scrutiny. *See White*, 533 F.3d at 394-395 (noting that the "inherently subjective determination" of White's interview performance was "easily susceptible to manipulation in order to mask the interviewer's true reasons for making the promotion decision."). However, in *White*, the employer had selected a candidate who had *significantly* inferior qualifications. In addition, *White* represents the exception rather than the rule.[10]

In the vast majority of cases, courts are loath to interfere with a manager's prerogative to conduct interviews in the form and fashion with which he or she sees fit, so long as the form and fashion do not implicate impermissible discrimination. *See Sigall-*

---

[10]The *White* court did not discuss earlier binding precedent including *Bender*. In addition, the record in *White* included significant evidence of racially discriminatory animus toward the plaintiff that added to the qualifications disparity. During his interview, the plaintiff was rated negatively as "aggressive" when he pointed out the lack of racial diversity in the company, especially in management positions.

*Drakulich v. City of Columbus*, 156 Fed. Appx. 791, 799 (6th Cir. 2005) (declining to "venture into the territory of telling employers the form and extent of hiring interviews," and averring that "it would be inappropriate to interfere with a manager's prerogative to conduct interviews in the form and fashion with which he or she sees fit, so long as the form and fashion do not implicate impermissible discrimination." Allowing employers to make decisions on "subjective" factors such as interviews is consistent with the "honest belief" rule. See *Russell v. Michigan Dept. of Health and Human Services*, 2018 WL 1168981 at *9 (E.D. Mich. March 6, 2018) ("[T]he prevailing rule in this Circuit is that if an employer has an 'honest belief' in the nondiscriminatory basis upon which it has made its employment decision…, then the employee will not be able to establish pretext.").

Because employers are not required to make objectively perfect decisions, a plaintiff cannot show pretext by arguing that the employer should have relied solely on objective criteria, or based its decision on factors that the plaintiff would have preferred. Thus, in *Sigall-Drakulich*, the court granted summary judgment to the City after noting that, despite Plaintiff's criticism that the interviewer failed to sufficiently inquire into her knowledge, skills and abilities during the interview, she failed to allege that interviewer made any discriminatory remarks or allusions. *See also Heath v. Ohio Turnpike Com'n*, 85 Fed. Appx. 494, 497 (6th Cir. 2004) (stating that "poor interview performance is a legitimate reason for not promoting an employee"); *Davis v. Cintas Corp.,* 717 F.3d 476, 494 (6th Cir. 2013) (poor performance during interview process was legitimate, nondiscriminatory reason for not hiring); *Johnson v. Lockheed Martin Corp.*, 598 Fed. Appx. 364, 369 (6th Cir. 2015) (plaintiff's disagreement with interview scores insufficient to show pretext); *Lawroscki v. Nationwide Mut. Ins. Co.,* 570 Fed. Appx. 589, 594 (6th Cir. 2014) (low scores in interview process as well as superior's negative impression of

candidate constituted nondiscriminatory reasons); *Briggs v. Potter*, 463 F. 3d 507 (6th Cir. 2006) (affirming summary judgment on age discrimination claim where plaintiff failed to show that employer's nondiscriminatory reasons for the failure to promote, including plaintiff's poor interview, were pretextual); *Bargo v. Goodwill Indus. of Kentucky, Inc.*, 2014 WL 7359047 (E.D. Ky. 2014) (decision based on interview performance was legitimate and nondiscriminatory).

Here, the same outcome is obtained because Plaintiff has failed to produce more than a scintilla of evidence to support her claim of pretext. Sullivan testified that Smith impressed her because in her interview, she "was so eager to make change and that hadn't been the culture at the office." (Doc. 20 at PageID 498). According to Isom, Smith "exuded confidence. She just made me feel like she was someone that was going to continue with great innovations. And she was a big picture thinker, and I was impressed." (Doc. 16 at PageID 198). Sturkey similarly testified that Smith stood out. "Catherine went from frankly as sort of a long shot to the top contender. She won it in that interview and that's how Karen fell from someone who I thought had an advantage going in to someone who ultimately finished third." (Doc.. 25 at PageID 731). In contrast to Plaintiff, the panelists consistently described Smith as "driven" "sharp" and a "big picture thinker." (Doc. 20 at PageID 492; Doc. 25 at PageID 663; Doc. 16 at PageID 198).

Unlike Smith, Sturkey recalled that Plaintiff performed poorly and "feeling a bit surprised that she didn't do better and feeling that she was unprepared." (Doc. 25 at PageID 659). He recalled discussing that with Isom and Sullivan and the sense that Plaintiff "walked in thinking she was going to get it, that she was entitled to it and didn't take the interview process seriously." (Doc. 25 at PageID 660). The panel was "underwhelmed and [thought] that she was not the best candidate for the job, not the

second best candidate for the job." (*Id.* at PageID 661). Explaining his disappointment, Sturkey testified that a "candidate who should have had the best and most intimate knowledge of those systems and those processes come in and essentially say because it's the way we've always done it, this is the way we do it, and it's fine just the way it is, that couldn't have been a worse answer." (*Id.* at PageID 731). Sturkey perceived that Plaintiff's "answers were not well thought out." (*Id.*at PageID 660).

Isom testified to her similar impression that Plaintiff "was not as zealous. I felt that Karen entered the interview as if it were a mere formality, that it was already her job to have. I didn't feel like Karen was going to bring any change as far as the organization." (Doc. 16 at PageID 200). Likewise, Sullivan testified that she did not see Plaintiff exhibiting the "level of drive and motivation to identify problems and be solutions-focused or make reformations or significant changes." (Doc. 20 at PageID 489, 493). She believed Plaintiff lacked "the general aggressive, innovative thinking and desire to make change as well as there was nothing in [Plaintiff's] statements or [Isom's] commentary on Karen's performance regarding her stepping up and leading the team in a very direct way. It was more of a day-to-day operations." (*Id.* at PageID 493).

Plaintiff complains that the Defendant's stated reasons cannot be the real reasons because the panelists' individual assessments had "no basis in fact." Plaintiff insists that the panelists relied on "age-related stereotypes," based upon their perception that Plaintiff appeared less interested in "modernization" and "professionalism." Contrary to Plaintiff's characterization, however, the panelists' "pros and cons" discussions were memorialized in part by contemporaneous notes, and they offered multiple examples of the responses to both interview and written questions that supported their respective (and shared) evaluations of Plaintiff's performance.

For example, Plaintiff's response to Question 9 was interpreted in the "con" category. Question 9 read: "Have you ever had to interact with a difficult personality? Have you ever had to provide services to a rude or demanding customer? What happened?" (Doc. 20-6 at PageID 560). Plaintiff responded by saying she would take the issue with a difficult customer to someone above her and "remove herself from the situation as opposed to working through it." (Doc. 20 at PageID 494; Doc. 20-1 at PageID 548).

Question 16 asked: "how do you plan to build relationships with your staff?" (Doc. 20-6 at PageID 560). Plaintiff again gave an answer that was viewed as a "con" because she responded that her coworkers already respected her, without considering the future, including when new hires onboard. (Doc. 20-1 at PageID 548). Sturkey explained that the answer did not "actually giv[e] us real substantive chunks of things she would do to build relationships with the staff, just assuming it's all good because they all know me." (Doc. 25 at PageID 683-684).

Plaintiff complains most bitterly about Question 18, suggesting that the wording of that query strongly supports a finding of pretext. It does not. Question 18 read: "As you know, leadership opportunities in this office are finite. We are working very hard to ensure these opportunities are given to employees that are committed to the long-term success of this office. How long do you see yourself committed to this role?" (Doc. 20-1 at PageID 534). Plaintiff responded by first asking Isom (who was in her late 40's) when she could retire, before Plaintiff responded that she planned to work for three years. The panel evaluated Plaintiff's answer as a "con" because the substance of Plaintiff's answer did not address what the Clerk's office was trying to achieve in "really systematic culture change, change management practices, stronger management of individuals." (Doc. 20 at PageID

415).  The panel thought that Plaintiff's response reflected "a short-term view of this role. May not have higher aspirations for the role or how she can build it."  (Doc. 20-1 at PageID 524).  Sturkey stated that Plaintiff's response suggested a lack of interest "in building up that particular role."  (Doc. 25 at PageID 739).  Isom similarly testified that Plaintiff's response did not "address the essence of what we were looking for other than just how long are you planning on being here."  (Doc. 16 at PageID 202).

Contrary to Plaintiff's view, the language in Question 18 that inquired about the applicant's long-term commitment does not show age discrimination or pretext.  Courts regularly have held that even more direct comments relating to an employee's expected retirement date do not provide evidence of age discrimination.  *See Woythal v. Tex-Tenn Corp.*, 112 F.3d 243, 247 (6th Cir. 1997); *Metz v. Titanium Metals Corp.*, 475 Fed. Appx. 33, 35 (6th Cir. 2012).  Sullivan testified that the intention behind Question 18 was to convey "a commitment and an understanding as to what would be required in the role, and that it would generally take time or would require ambitious planning."  (Doc. 20 at PageID 450).

As evidence that the panelists erred in their evaluation and ignored facts based on age discrimination, Plaintiff complains that the panelists should have considered that Plaintiff had recommended several beneficial changes over the years, including encouraging wider use of email and streamlining the process for certificates of judgment. However, Plaintiff did not bring up those past changes or suggestions for change during her interview.  Although Isom was Plaintiff's supervisor, an employer is not required to have a perfect recall of an applicant's prior successes.  There is nothing in the record to suggest that, during the evaluation process, Isom independently recalled the initiatives to which Plaintiff testified in her deposition.

Also undermining Plaintiff's argument is the fact that during her interview, Sturkey altered the substance of Question 2 in order to elicit precisely the type of information that Plaintiff failed to volunteer.  The original format of Question 2 asked: "What type of cases and other work responsibilities is the MCV division responsible for within the Clerk's Office?  What role does the Case Management Dept. play in the division?" Sturkey explained that because Plaintiff was the sole candidate who worked in the Division and knew the day-to-day work, he posed the alternative question: "[W]hat sort of adjustments or improvements would you like to make in the office?"  (Doc. 25 at PageID 658).  He was not impressed with Plaintiff's response:  "I thought it was substandard, and it didn't seem like she was understanding that what we were trying to do in the clerk's office going back to modernization and professionalism."  (*Id*. at PageID 660).  Thus, despite the inclusion of open-ended questions and being provided a specific opportunity to bring up past successes or to offer future ideas in response to Question 2, Plaintiff failed to bring up either past or future ideas for changes, recommendations or suggestions.  (Doc. 18 at PageID 307-308).

Plaintiff complains that the stated reasons did not actually motivate the promotional decision.  She argues that the true reason for her coming in second to Smith (and third overall) was age discrimination masked by the subjective nature of the panel's focus on the interview scores.  As support for this hypothesis, Plaintiff points to an email sent from Sullivan to Isom that encouraged her to consider "who would be the better long-term leader." (Doc. 20-11 at PageID 574).  Plaintiff asserts that the email "smack[s] of ageism" and was sent "[j]ust before" Isom made her final decision, proving that Sullivan and the panel used impermissible criteria (age) in its selection of Smith. (Doc. 35 at PageID 886).

Despite Plaintiff's insistence that the email was sent "<u>immediately</u> before Isom

made her final decision," (*Id.* at PageID 895, emphasis original), the record reflects that the email was sent *before* the three panelists met for an in-depth discussion of the pros and cons of the candidates. (Doc. 16 at PageID 179). In addition, the email is consistent with the facially neutral Question 18 that asked each applicant to comment on their commitment to the "long-term success" of the office. Finally, Isom testified to her reliance on the scoring chart in making her final decision, not Sullivan's email. (Doc. 16-7 at PageID 241).

In a last attempt to raise an issue of fact on pretext, Plaintiff argues that the Defendant's stated reason was "insufficient to motivate the decision," because the Defendant relied upon "thoroughly subjective criterion of interview performance" rather than solely objective criteria. Plaintiff suggests that the panelists "can now literally say whatever they want about Plaintiff's performance," insinuating that the panelists' testimony should be disbelieved in the absence of recordings of the interviews. (Doc. 35 at PageID 895). However, the panelists took contemporaneous notes, and there is no basis other than Plaintiff's own unsupported speculation to disbelieve those notes and sworn deposition testimony concerning Plaintiff's performance. The panel's view of Plaintiff's interview performance is also consistent with their evaluation of Smith's and Plaintiff's written responses, which also reflected Plaintiff's lower overall score.

In sum, Plaintiff's subjective belief that she was the better "objectively" qualified candidate over Smith or that she did "well" in her interview does not create a genuine issue of material fact concerning pretext. *See Hedrick*, 355 F.3d at 462 (holding that a plaintiff's "subjective view of her qualifications in relation to those of other applicants, without more, cannot sustain a claim of discrimination."); *Brennan v. Tractor Supply Co.*, 237 Fed. Appx. 9, 23 (6th Cir. 2007) (holding that a plaintiff's "perception of his

competence and the incompetence of those competing against him, is irrelevant." (citing *Wrenn v. Gouild*, 808 F.2d 493, 502 (6th Cir. 1987)); *Briggs v. Potter*, 463 F.3d at 516 (plaintiff's subjective view of his own qualifications in relation to other applicants insufficient to show pretext); *Plumb v. Potter*, 212 Fed. Appx. 472, 480 (6th Cir. 2007); *Russell v. Michigan Dept. of Health and Human Services*, 2018 WL 1168981 at *8 (rejecting the plaintiff's premise that pretext could be shown based upon a panel's "subjective assessment" of the interview process, where the plaintiff failed to offer "a shred of evidence that any of the defendants harbored any 'discriminatory views,' that the interview scoring process was flawed, or that the defendants did not rely on those scores in good faith when making their promotion decision").

## IV.    Plaintiff's State law claim is Precluded

Defendant argues that Plaintiff's closely related state law claim, under Ohio R.C. § 4112.14, is precluded due to her choice to file an administrative action with the EEOC. The undersigned declines to consider this argument.  Instead, the Court grants judgment to the Defendant based upon its alternative argument that Ohio generally follows the same analytic framework established by federal case law for use under the ADEA. Because Plaintiff has not presented a genuine issue of material fact to proceed to trial on the issue of pretext under the ADEA, her related state law claim also fails.

## V.    Conclusion and Order

Based on the record as a whole, no reasonable jury could find in favor of the Plaintiff in this case.  Accordingly, **IT IS ORDERED** that Defendants' motion for summary judgment (Doc. 32) be **GRANTED**, and that this case be **DISMISSED.**

_s/ Stephanie K. Bowman_
Stephanie K. Bowman
United States Magistrate Judge